# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

AVENTURE COMMUNICATION
TECHNOLOGY, L.L.C., an Iowa
corporation,

        Plaintiff,

vs.

IOWA UTILITIES BOARD, Utilities
Division, Department of Commerce;
ROBERT B. BERNTSEN, KRISTA K.
TANNER, and DARRELL HANSON, in
their Official Capacities as Members of
the Iowa Utilities Board and not as
Individuals,

        Defendants,

and

VERIZON COMMUNICATIONS, INC.,
MCIMETRO ACCESS
TRANSMISSION SERVICES, L.L.C.,
d/b/a Verizon Access Transmission
Services, MCI COMMUNICATIONS
SERVICES, INC., d/b/a Verizon
Business Services; QWEST COMMUNI-
CATIONS COMPANY, L.L.C., f/k/a
Qwest Communications Corporation;
AT&T COMMUNICATIONS OF THE
MIDWEST, INC.; TCG OMAHA; and
SPRINT COMMUNICATIONS
COMPANY, L.P.,

        Intervenors/defendants.

No. C 10-4074-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING AVENTURE'S
MOTION FOR PRELIMINARY
INJUNCTION AND
INTEREXCHANGE CARRIERS'
MOTIONS TO INTERVENE**

_____

# TABLE OF CONTENTS

*I. INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   *A. Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
      *1.*   *The entities involved and their dispute* . . . . . . . . . . . . . . . . . . 4
      *2.*   *The IUB's rule-making* . . . . . . . . . . . . . . . . . . . . . . . . 5
      *3.*   *Aventure's tariff revisions* . . . . . . . . . . . . . . . . . . . . . . 13
   *B. Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*II. LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
   *A. Intervention* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
   *B. Qwest's "Jurisdictional" Challenges* . . . . . . . . . . . . . . . . . . . . . 24
   *C. Standards For Preliminary Injunctive Relief* . . . . . . . . . . . . . . . . 27
   *D. Application Of The Standards* . . . . . . . . . . . . . . . . . . . . . . . . . . 28
      *1.*   *Likelihood of success* . . . . . . . . . . . . . . . . . . . . . . . . . 29
          *a.*   *Applicable standards* . . . . . . . . . . . . . . . . . . . . . . 29
          *b.*   *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
             *i.*   *Vagueness* . . . . . . . . . . . . . . . . . . . . . . 32
             *ii.*   *Barriers to competition* . . . . . . . . . . . . . . . 37
             *iii.*   *Interference with interstate commerce* . . . . . . . 41
             *iv.*   *Violation of Iowa law and the filed rate doctrine* . . . . . . . . . . . . . . . . . . . . . . . . 43
      *2.*   *Threat of irreparable harm* . . . . . . . . . . . . . . . . . . . . . . 47
          *a.*   *Applicable standards* . . . . . . . . . . . . . . . . . . . . . . 47
          *b.*   *Arguments of the parties* . . . . . . . . . . . . . . . . . . . 48
          *c.*   *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
      *3.*   *Balance of harms* . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
          *a.*   *Applicable standards* . . . . . . . . . . . . . . . . . . . . . . 50
          *b.*   *Arguments of the parties* . . . . . . . . . . . . . . . . . . . 52
          *c.*   *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
      *4.*   *The public interest* . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*III. CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

A competitive local exchange carrier (CLEC), which provides interstate and intrastate exchange access telephone service, as well as local, long distance, and enhanced telephone services to business and residential customers in Iowa, seeks a preliminary injunction enjoining action to enforce an order of the Iowa Utilities Board (IUB) concerning "high volume access service" (HVAS). HVAS includes conference bridges, chat lines, help desks, and other services based upon a high volume of incoming and outgoing calls. The IUB, its members, and four prospective intervenors—interexchange carriers (IXCs) that terminate long-distance calls to telephone numbers assigned to the CLEC—oppose such a preliminary injunction.

## I. INTRODUCTION

### A. Factual Background

The court is mindful of the general rule that "the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits." *University of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S. Ct. 1830, 68 L. Ed. 2d 175 (1981); *accord United States Sec. and Exchange Comm'n v. Zahareas*, 272 F.3d 1102, 1105 (8th Cir. 2001) ("[W]e have long held that 'findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding.'") (quoting *Patterson v. Masem*, 774 F.2d 251, 254 (8th Cir. 1985)); *National Credit Union Admin. Bd. v. Johnson,* 133 F.3d 1097, 1103 n. 5 (8th Cir. 1998) (quoting this principle from *Camenisch*); *Henderson v. Bodine Aluminum, Inc.,* 70 F.3d 958, 962 (8th Cir. 1995) (citing this statement from *Camenisch* as the "general rule" for findings of fact and

conclusions of law in preliminary injunction rulings). Thus, all findings of fact in this ruling are provisional.

### 1. The entities involved and their dispute

Plaintiff Aventure Communication Technology, L.L.C. (Aventure), alleges that it is a so-called competitive local exchange carrier or CLEC, that is, a telecommunications carrier that operates a local telephone network and provides switched exchange access to that network by long distance companies, so-called interexchange carriers or IXCs, including Qwest Communications Company, L.L.C. (Qwest), Verizon Communications, Inc. (Verizon), AT&T Corporation (AT&T), and Sprint Communications Company, L.P. (Sprint). Access to Aventure's local telephone network allows the IXCs to complete long distance calls placed by the IXCs' long distance customers to numbers that have been assigned to Aventure's local customers. Aventure's business customers include companies that provide conference calling services to the public. Callers reach the conference calling "bridges" by dialing a long distance telephone number, just as they would to call any other residential or business telephone number in Iowa. IXCs must compensate Aventure for calls from IXCs completed to numbers assigned to Aventure's customers by paying a "terminating access charge." Aventure's compensation rates—its tariffs—are regulated, in part, by the Federal Communications Commission (FCC), which has jurisdiction over long distance calls that cross state boundaries (interstate or international traffic), and, in part, by the Iowa Utilities Board (IUB), which has jurisdiction over calls that originate and terminate within the state of Iowa (intrastate traffic). Approximately 98% of Aventure's long distance traffic is interstate, while the rest is intrastate.

This dispute is one of a series of disputes between Iowa LECs, like Aventure, and IXCs, such as Qwest, Verizon, AT&T, and Sprint, about whether the IXCs must pay access charges to the Iowa LECs for traffic terminated to conference call providers and

other high volume access services. Aventure contends that the IXCs have refused to pay the tariffed rates for calls terminated to Aventure's conference call providers. The IXCs assert that Aventure is engaged in "traffic pumping" or "access stimulation," involving actively pursuing then billing a high volume of calls to free calling service companies that do not qualify for switched access service at rates determined on historically low volume and relatively high costs per call.

Of particular interest here is a state-based case before the IUB initiated by Qwest in February 2007, identified by Aventure as the *IUB Proceedings*, but more precisely identified as *Qwest Communications Corp. v. Superior Tel. Coop.*, IUB Docket No. FCU-07-2. In the *IUB Proceedings*, Qwest alleged that it did not owe eight LECs, including Aventure, the terminating access charges for which Qwest had been billed and that, to the extent that Qwest had paid any of those charges, it was entitled to a refund. Eventually, in a Final Order in the *IUB Proceedings* dated September 21, 2009, the IUB found that the conference-calling service providers did not subscribe to services provided by the LECs pursuant to their tariffs—*i.e.*, they were not "end users" under those tariffs—so that Qwest did not owe access charges to the LECs for traffic delivered to the conference call service providers. The Final Order also announced that the IUB would initiate formal rule-making proceedings to consider the policy issues raised in its Final Order.

### 2. The IUB's rule-making

Indeed, on September 18, 2009, the IUB issued an order establishing Docket No. RMU-2009-0009 and commencing a rule-making proceeding (the *IUB Rule-Making Proceedings*). *See In re High Volume Access Services*, RMU-2009-0009, Order Initiating Rule Making (IUB Sept. 18, 2009) ("HVAS NPRM"), attached to Aventure's Motion For Preliminary Injunction as Exhibit 2. In that notice, the IUB proposed to amend its rules "to address High Volume Access Service (HVAS) and the effect HVAS can have on a

local exchange carrier's (LEC's) revenues from intrastate switched access services." *HVAS NPRM* at 1.

The IUB released its Order Adopting Rules (*HVAS Order*) in the *IUB Rule-Making Proceedings* on June 7, 2010. *See* Complaint, Exhibit 1. In the *HVAS Order*, the IUB explained that the rules amendments were, in particular, "focused on situations in which an [sic] LEC's rates for intrastate access services are based, indirectly, on relatively low traffic volumes, but the LEC then experiences a relatively large and rapid increase in those volumes, resulting in a substantial increase in revenues without a matching increase in the total cost of providing access service." *HVAS Order* at 1. The *HVAS Order* recognized,

> This can happen, for example, as a result of adding an [sic] HVAS customer that offers conference bridges, chat lines, help desks, or other services that are based upon high volumes of incoming or outgoing interexchange calls. The result is an increase in the LEC's access service minutes, which leads in turn to a matching increase in the amount the LEC bills to interexchange carriers (IXCs) for switched access services. When this situation is actively pursued by the LEC, it is sometimes referred to as "access stimulation."

*HVAS Order* at 1-2.

The court finds the "Background" to the amendment of the rules in the *HVAS Order* to be particularly instructive. Therefore, the court quotes that "Background" here, in its entirety:

> The Federal Communications Commission (FCC) has described access stimulation and the economic incentives for it under the federal system of rate regulation as follows:
>> Oversimplifying somewhat, to establish their rates, rate-of-return carriers calculate a revenue requirement, which is intended to recover expenses plus a reasonable rate of return. Once the revenue requirement is determined, carriers propose prices for all interstate

services, which, when multiplied by historical or projected demand, are targeted to equal the revenue requirement. If, after rates are set, actual demand and expenses differ from the estimated demand and expenses, the realized rate-of-return may be greater or less than the targeted rate of return. The limited information we have suggests that, in certain instances, some LECs are experiencing dramatic increases in demand for switched access services. If the average cost per minute falls as demand grows, the realized rates of return are likely to exceed the authorized rate of return and thus the tariffed rates become unjust and unreasonable at some point. It is well established that there is a large fixed cost to purchasing a local switch and that the marginal or incremental cost of increasing the capacity of a local switch is low (some contend that it is zero ) and certainly less than the average cost per minute of the local switch. Thus, if the average revenue per minute remains constant as demand grows, but the average cost per minute falls (which occurs if the marginal cost per minute is less than the average cost per minute) then profits (or return) will rise. This principle is equally applicable to all LECs. Moreover, the cost of local switching increases incrementally, while the price for local switching is established based on average costs, which are significantly higher. As a result, most of the switch costs are recovered by the demand used to establish the local switching rate. Carriers offering tandem switching services would experience a similar effect for their tandem switching costs. Accordingly, when local switching demand increases significantly, a carrier's increased revenues generally will exceed any cost increases. As a result, a carriers' rate of return at some point is likely to exceed the maximum allowed rate of return, making the rates unjust and unreasonable.

A similar effect to that associated with local switching would also occur in the transport segment of the exchange access network. As demand increases, the number of circuits needed for transmission will increase. Again, the incremental cost is lower than the average cost (although the disparity is likely not as great as in the local switching case), which would lead to the rates for transport becoming unreasonable at some point as demand increases.

In the Matter of Establishing Just and Reasonable Rates for Local Exchange Carriers, WC Docket No. 07-135, "Notice of Proposed Rulemaking" at ¶¶ 14-15 (FCC October 2, 2007) (hereinafter the FCC Notice).

The system in Iowa is slightly different because the Board does not have rate regulation jurisdiction over a LEC's intrastate access charges to the same extent as the FCC has over interstate access charges. Iowa Code § 476.11 gives the Board jurisdiction over the terms and procedures under which toll (or interexchange) communications are interchanged, but only after a written complaint is filed by one of the telephone companies involved. This complaint-based jurisdiction means the Board is unable to order individual LECs to file new tariffs for switched access service rates on its own initiative, as the FCC has proposed to do in the FCC Notice. Thus, while the Board is aware of the FCC Notice and has given it consideration when preparing this order, the Board is not proposing to adopt the same type of rules that the FCC has described.

Even in a reduced-regulation environment, the cost of filing an individual intrastate access service tariff for each LEC can be substantial. Filing costs are particularly important when those costs are being spread over a fairly small customer base, resulting in a relatively large cost per customer. In order to reduce that burden, the Board has adopted rules that allow associations of local exchange utilities to file intrastate access service tariffs. Non-rate-regulated local exchange utilities may then concur in the association tariff. See 199 IAC

22.14(2)(b)(1). Most small LECs have opted into the association tariff filed with the Board by ITA. The access rates contained in ITA's intrastate tariff have generally mirrored interstate rates filed by the National Exchange Carrier Association (NECA) with the FCC. However, when NECA began the process of reducing some of its interstate rates, ITA elected not to adopt the reduced rates in its intrastate tariff.

In July of 2007, several IXCs filed objections to rate changes proposed by ITA for its intrastate access tariff. After holding formal contested case proceedings on the proposed changes, the Board ordered certain of the rates in ITA's intrastate tariff to be set at the same level as NECA's current rates for those elements. Those rates in ITA's intrastate tariff continue to be based on the NECA rates, which are supported by interstate costs. This has been a cost-effective method of setting intrastate rates in the ITA tariff, but it did not allow for the possible effect of HVAS.

All elements of association tariffs are subject to Board review and approval, pursuant to 199 IAC 22.14(2)(b)(2). These rules give the Board jurisdiction to address the HVAS situation as it arises under an association tariff. Because HVAS situations tend to be fact-sensitive and individualized, the Board has concluded that HVAS calls should not be billed for access services pursuant to an association tariff. Under the adopted rules, any LEC providing HVAS must file an individual tariff for that service (although it may continue to concur in an association tariff for all other access services).

To the extent an individual LEC opts to file an individual tariff for intrastate access services, either HVAS only or for all such services, the Board's rate jurisdiction is limited to the circumstances specified in § 476.11. Even for those situations, however, the Board proposed to adopt rules setting out the standards by which it will rule on the reasonableness of an individual LEC tariff if a complaint is filed pursuant to § 476.11. To that end, the adopted rules specify certain procedures that will be required in order to

ensure reasonable HVAS access rates, such as prohibiting the application of association access rates to HVAS traffic, a requirement to engage in good faith negotiations for intrastate access rates, and final Board approval of HVAS tariff provisions.

The adopted rules define an [sic] HVAS situation in terms of a rapid increase in access volumes (access growth of more than 100 percent in six months). For established LECs, this should be an effective test. The Board realizes that a new entrant's intrastate access billings are likely to exceed the HVAS threshold proposed in these rules even if the company is not engaged in true HVAS activities, simply because the company's normal intrastate access volumes are likely to be increasing rapidly (when measured on a percentage growth basis). It has generally been the Board's policy to issue a certificate of public convenience and necessity to a new entrant in the telecommunications industry in Iowa within six months of the date the new carrier plans to commence service to enable the company to apply for, and activate, new telephone numbers within the time permitted by the North American Numbering Plan. Under these adopted rules, a new entrant should provide notice to all affected carriers, pursuant to 199 IAC 22.14(2)"e," within the six-month period before it begins providing local exchange service. Under the same rule, any negotiations between the new entrant and interexchange utilities should conclude within 60 days. Therefore, a new entrant should be able to have an approved and effective access tariff on file with the Board by the time it begins providing service in Iowa.

*HVAS Order* at 3-8 (footnote omitted).

In the *HVAS Order*, the IUB adopted the following definition for High-Volume Access Service:

"High-volume access service (HVAS)" is any service that results in an increase in total billings for intrastate exchange access for a local exchange utility in excess of 100

10

percent in less than six months. By way of illustration and not limitation, HVAS typically results in significant increases in interexchange call volumes and can include chat lines, conference bridges, call center operations, help desk provisioning, or similar operations. These services may be advertised to consumers as being free or for the cost of a long distance call. The call service operators often provide marketing activities for HVAS in exchange for direct payments, revenue sharing, concessions, or commissions from local service providers.

*HVAS Order*, Utilities Division [199] at 3 (amending 199 IAC 22.1(3)). The *HVAS Order* also adopted an amendment to 199 IAC 22.14(2)"d"(8) "prohibiting the application of association access service rates to HVAS traffic." *Id.*

The *HVAS Order* then adopted an entirely new paragraph 22.14(2)"e," with revisions from the proposed rule indicated by strikeouts and underlining:

e. A local exchange utility that is adding a new HVAS customer or otherwise reasonably anticipates an [sic] HVAS situation shall ~~notify interexchange utilities~~ provide notice of the situation, the telephone numbers that will be assigned to the HVAS customer (if applicable), and the expected date service to the HVAS customer will be initiated, if applicable. Notice should be sent to each interexchange utility that paid for intrastate access services from the local exchange carrier in the preceding 12 months; to any carrier with whom the local exchange carrier exchanged traffic in the preceding 12 months; and all other local exchange carriers authorized to provide service in the subject exchange; by a method calculated to provide adequate notice. Any interexchange utility may request negotiations concerning the access rates applicable to calls to or from the HVAS customer.

Any interexchange utility that believes a situation has occurred or is occurring that does not specifically meet the HVAS threshold requirements defined in subrule 22.1(3), but which raises the same general concerns and issues as an [sic]

<u>HVAS situation may file a complaint with the board pursuant to these rules.</u>

A local exchange utility that experiences an increase in intrastate access billings that qualifies as an [sic] HVAS situation, but did not add a new HVAS customer or otherwise anticipate the situation, shall notify interexchange utilities of the HVAS situation at the earliest reasonable opportunity, as described in the preceding paragraph. Any interexchange utility may request negotiations concerning whether the local exchange utility's access rates, as a whole or for HVAS only, should be changed to reflect the increased access traffic.

When a utility requests negotiations concerning intrastate access services, the parties shall negotiate in good faith to achieve reasonable terms and procedures for the exchange of traffic. No access charges shall apply to the HVAS traffic until an access tariff for HVAS is accepted for filing by the board and has become effective. At any time that any party believes negotiations will not be successful, any party may file a written complaint with the board pursuant to Iowa Code section 476.11. In any such proceeding, the board will consider setting the rate for access services for HVAS traffic based upon the incremental cost of providing HVAS, although any other relevant evidence may also be considered. The incremental cost will not include marketing or other payments made to HVAS customers. The resulting rates for access services may include a range of rates based upon the volume of access traffic or other relevant factors. <u>Any interexchange carrier that believes a situation has occurred or is occurring that does not specifically meet the HVAS threshold requirements defined in subrule 22.1(3), but which raises the same general concerns and issues as an [sic] HVAS situation, may file a complaint with the board.</u>

*HVAS Order*, Utilities Division [199], at 3-5.

Finally, the *HVAS Order* amended the introductory paragraph of subrule 22.20(5), with amendments underlined, as follows:

12

> **22.20(5)** Certificate revocation.  Any five subscribers or potential subscribers, <u>an interexchange utility</u>, or consumer advocate upon filing a sworn statement showing a generalized pattern of inadequate telephone service or facilities may petition the board to begin formal certificate revocation proceedings against a local exchange utility.  <u>For the purposes of this rule, inadequate telephone service or facilities may include the failure to bill high-volume intrastate access (HVAS) charges in a manner consistent with the requirements of 199 IAC 22.14.</u>  While similar in nature to a complaint filed under rule 199-6.2(476), a petition under this rule shall be addressed by the board under the following procedure and not the procedure found in 199—Chapter 6.

*HVAS Order*, Utilities Division [199], at 5.

Aventure contends that, if the IUB revokes a certificate of public convenience and necessity in Iowa, it will have the effect of prohibiting the LEC from, *inter alia*, receiving telephone numbers from the North American Numbering Plan Administrator (NANPA) and the Number Pooling Administrator.  Aventure asserts, further, that without the ability to receive telephone numbers, the LEC will be effectively prohibited from providing both intrastate communication service (subject to the Board's jurisdiction) and interstate communication service (subject to the exclusive jurisdiction of the FCC).

The amendments to the rules set forth in the *HVAS Order* became effective on August 4, 2010.  *HVAS Order* at 3.

### 3. *Aventure's tariff revisions*

On October 12, 2009, shortly after the *IUB Rule-Making Proceedings* began, Aventure filed proposed changes to its local exchange tariff with the IUB.  Among other things, the proposed changes would have allowed Aventure to provide local exchange service in Sioux City, Iowa, which is an exchange served by Qwest Corporation.  Aventure's goal in doing so was to provide services to five commercial customers,

requesting 555 lines in the Sioux City exchange, waiting to subscribe to Aventure's service. On November 23, 2009, however, the IUB docketed Aventure's tariff for further investigation, because "Aventure has not provided any assurances in its proposed tariff amendments, or any other filings with the Board, indicating that it intends to provide local exchange service to end user customers in a manner that is consistent with the Board's ruling in [the *IUB Proceedings*]." Aventure's Motion For Preliminary Injunction, Exhibit 1 (Affidavit of James McKenna), Attachment B, at 3.

On December 1, 2009, Aventure filed a Motion To Approve The Tariff Revision, *see* Aventure's Motion For Preliminary Injunction, Exhibit 1 (Affidavit of James McKenna), Attachment D, purportedly answering the IUB's questions and urging that it be granted authority quickly, so that it could begin serving customers. However, the IUB did not respond until January 13, 2010, and when it did, it required Aventure to make additional filings and certifications before the IUB would approve Aventure's Sioux City expansion tariff. *See* Aventure's Motion For Preliminary Injunction, Exhibit 1 (Affidavit of James McKenna), Attachment E ("If Aventure is able to offer a satisfactory response to each of these issues [raised by its proposed tariff filing], the Board may be in a position to make the necessary findings and approve Aventure's proposed tariff revision," and enumerating the issues, one of which was a statement that Aventure will comply with the requirements of the *IUB Rule-Making Proceedings*). In response, on January 27, 2010, Aventure withdrew its request for approval of its tariff revisions, because the delay in the IUB approval process had caused Aventure's potential customers in the Sioux City area to find another provider. Even so, Aventure agreed to comply with the conditions set forth in the IUB's January 13, 2010, order in the *IUB Proceedings*.

On July 8, 2010, Aventure filed a superseding access tariff and revisions to its local exchange tariff. Several parties, including Qwest and Sprint, filed resistances to the approval of the switched access tariff and asked the IUB to reject or suspend it, in part, because, they contend, Aventure had not complied with the new rules adopted by the IUB in the *HVAS Order*, but which had not yet become effective. No parties objected to the proposed revisions to Aventure's local exchange tariff. The IUB had not taken action on Aventure's new access tariff at the time that Aventure filed its Motion For Preliminary Injunction in this court. However, on August 10, 2010, the IUB suspended Aventure's proposed tariff changes, *inter alia*, on the ground that it appeared to conflict with the Final Order in the *IUB Proceedings*. Aventure's Motion For Temporary Restraining Order (docket no. 41), Exhibit A.

## B. Procedural Background

On August 2, 2010, Aventure filed its Complaint For Declaratory, Injunctive, And Other Relief (docket no. 2), challenging the *HVAS Order*. Aventure named as defendants the IUB and its individual members, in their official capacities. Although only the individual board members, and not the IUB itself, have thus far entered appearances, the court will refer to the defendants collectively as the IUB.

In its Complaint, Aventure asserts the following claims: **Count I** alleges that the *HVAS Order* violates the Supremacy Clause of Article VI of the United States Constitution, in that the IUB has created state law that has the effect of prohibiting interstate telecommunications services, creating an actual conflict between federal and state law that would stand as an obstacle to the accomplishment and execution of the full objectives of Congress, as set forth in the Telecommunications Act of 1996, 47 U.S.C. § 253; **Count II** alleges that the *HVAS Order* violates the Commerce Clause of Article I, § 8, cl. 3, of the

United States Constitution, in that the *HVAS Order* imposes upon interstate commerce burdens that vastly exceed the putative intrastate benefits; **Count III** alleges that the *HVAS Order* violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution, in that it is vague, ambiguous, and arbitrary; **Count IV** alleges that the *HVAS Order* violates the Due Process Clause of Article I, § 9, of the Iowa Constitution, for essentially the same reasons that it violates federal due process; **Count V** alleges that, applying the standards for judicial review of agency action pursuant to IOWA CODE § 17A.19, the *HVAS Order* is unreasonable, arbitrary, capricious, and an abuse of discretion; **Count VI** alleges that the *HVAS Order* would violate the "filed rate doctrine" and IOWA CODE §§ 476.3 and 476.4; **Count VII** alleges that the *HVAS Order* violates IOWA CODE § 476.29(9), because that statutory provision permits revocation of a certificate to provide local telecommunications service only for failure to furnish reasonably adequate telephone service and facilities, but not for failure to treat HVAS charges in a manner consistent with the *HVAS Order*; **Count VIII** is a claim for declaratory judgment pursuant to 28 U.S.C. § 2201;[1] and **Count IX** is a request for preliminary and permanent injunctive

---

[1]Specifically, Aventure seeks declarations that (i) the *HVAS Order* is unlawful and unenforceable because it conflicts with federal law and impermissibly presents obstacles to competition in interstate telecommunications; (ii) the *HVAS Order* is unlawful and unenforceable because it impermissibly burdens interstate commerce; (iii) the *HVAS Order* is unlawful and unenforceable because it is unconstitutionally vague and ambiguous in violation of the due process clause of the United States Constitution and the Constitution of Iowa; (iv) the *HVAS Order* is unreasonable, arbitrary, and capricious, or an abuse of the IUB's discretion, in violation of Iowa law; (v) that the IUB cannot issue a rule that conflicts with a carrier's statutory obligation to pay tariffed access charges pursuant to state law and the filed-rate doctrine; and/or (vi) that the IUB cannot revoke a certificate of public convenience and necessity for failure to bill access services in the manner set forth in the proposed rules.

relief enjoining the IUB from enforcing the new provisions of 199 IAC 22.1(3) and 199 IAC 22.14 promulgated by the IUB in the *HVAS Order*.

This matter comes before the court pursuant to Aventure's August 3, 2010, Motion For Preliminary Injunction (docket no. 12); Verizon's[2] August 6, 2010, Motion To Intervene Pursuant to FRCP 24 (docket no. 20); Qwest's[3] August 9, 2010, Emergency Motion To Intervene Of Right (docket no. 24); AT&T's[4] August 10, 2010, Motion To Intervene Pursuant To FRCP 24 (docket no. 33), and Sprint's[5] August 10, 2010, Motion To Intervene Pursuant To FRCP 24 (docket no. 35). By Orders (docket nos. 19, 22, 27, 36), the court ordered expedited responses to these motions due by 5:00 p.m. (CDT) on Thursday, August 12, 2010, and set telephonic oral arguments on the motions for 8:00 a.m. (CDT) on Monday, August 16, 2010. The court also authorized Verizon, Qwest, AT&T, and Sprint to file responses to Aventure's Motion For Preliminary Injunction and to participate in the oral arguments on the Motion For Preliminary Injunction, but stated that the court's consideration of their arguments concerning the Motion For Preliminary Injunction would be subject to the court's ruling on their Motions To Intervene.

---

[2]The movant is Verizon Communications, Inc., including the wholly owned subsidiaries MCImetro Access Transmission Services, L.L.C., d/b/a Verizon Access Transmission Services, and MCI Communications Services, Inc., d/b/a Verizon Business Services, but it identifies itself individually and collectively simply as "Verizon."

[3]The movant is Qwest Communications Company, L.L.C. (Qwest), f/k/a Qwest Communications Corporation, but it identifies itself simply as "Qwest."

[4]The movants are AT&T Communications of the Midwest, Inc., and TCG Omaha, but they identify themselves collectively as "AT&T."

[5]The movant is Sprint Communications Company, L.P., but it identifies itself simply as "Sprint."

On August 10, 2010, Aventure filed Responses (docket nos. 29 & 30) to Qwest's and Verizon's Motions To Intervene stating that it had no resistance to those motions. On August 11, 2010, Aventure filed Responses (docket nos. 38 & 39) to Sprint's and AT&T's Motions To Intervene stating that it had no resistance to those motions, either. The IUB did not file any response to the Motions To Intervene by the deadline set by the court, but did state in subsequent oral arguments on the pending motions that it did not resist any of the Motions To Intervene. The IUB and each of the prospective intervenors also filed resistances to Aventure's Motion For Preliminary Injunction by the deadline on August 12, 2010. *See* Verizon's Resistance (docket no. 45); Sprint's Resistance (docket no. 47); IUB's Resistance (docket no. 48); Qwest's Resistance (docket no. 55); and AT&T's Resistance (docket no. 56).[6]

No party requested an evidentiary hearing on Aventure's Motion For Preliminary Injunction by the August 11, 2010, deadline set in the court's August 6, 2010, Order (docket no. 19). Therefore, the Motion For Preliminary Injunction was submitted on written submissions and oral arguments.

On August 12, 2010, Aventure filed a Motion For Temporary Restraining Order (docket no. 41), in which it asserted that action of the IUB on August 10, 2010, required immediate injunctive relief. In an Order Regarding Aventure's Motion For Temporary Restraining Order (docket no. 43), filed August 12, 2010, the court found nothing in the IUB's August 10, 2010, action that posed such an immediate threat to the continuation of Aventure's business that the court needed to hear or rule on Aventure's Motion For Temporary Restraining Order before the oral arguments already set on Aventure's Motion

---

[6]Qwest's and AT&T's Resistances were not filed until August 13, 2010, after the court granted leave to file overlength briefs. Their motions to file overlength briefs, with the pertinent briefs attached, were filed on August 12, 2010. *See* docket nos. 49 & 53.

For Preliminary Injunction. Therefore, the court denied Aventure's Motion For Temporary Restraining Order without prejudice to reassertion at the telephonic oral arguments on Aventure's Motion For Preliminary Injunction. At those oral arguments, in light of the court's representation that this ruling on Aventure's Motion For Preliminary Injunction would be filed by the end of the business day on August 18, 2010, Aventure did not reurge its request for a temporary restraining order.

The court heard telephonic oral arguments on the pending motions as scheduled on August 16, 2010. At the oral arguments, Aventure was represented by George David Carter, Jr., who argued the motions, and Jonathan Edward Canis of Arent Fox, L.L.P., in Washington, D.C., and by local counsel Paul D. Lundberg of the Lundberg Law Firm in Sioux City, Iowa. The individual members of the IUB[7] were represented by counsel David Jay Lynch, who argued the motions, and Jennifer Smithson in Des Moines, Iowa. Proposed intervenor Sprint was represented by Bret Alan Dublinske of Dickinson, Mackaman, Tyler & Hagen, P.C., in Des Moines, Iowa. Mr. Dublinske also appeared as local counsel for proposed intervenor Verizon, but Verizon was also represented by Scott Angstreich, who argued the motions on Verizon's behalf, and Gregory Rapawy of Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., in Washington, D.C. Proposed intervenor Qwest was represented by Charles W. Steese of Steese, Evans & Frankel, P.C., in Denver, Colorado, who argued the motion, and in-house counsel George Thompson. Proposed intervenor AT&T was represented by David Carpenter of Sidley Austin, L.L.P., in Chicago, Illinois, who argued the motion, and by Richard W. Lozier, Jr., of Belin McCormick, P.C., in Des Moines, Iowa, and Letty S.D. Friesen of AT&T in Denver, Colorado.

---

[7] Again, the IUB itself has not yet appeared in these proceedings.

The pending motions are all now fully submitted.

## II.  LEGAL ANALYSIS

Before considering Aventure's Motion For Preliminary Injunction, the court must determine which of the prospective intervenors, if any, should be allowed to resist that Motion along with the IUB.  The court will then turn to consideration of the arguments by the appropriate parties for and against the entry of a preliminary injunction.

### A.  Intervention

Verizon, Qwest, AT&T, and Sprint have all moved to intervene as of right pursuant to Rule 24(a)(2) of the Federal Rules of Civil Procedure.  Verizon, AT&T, and Sprint have also moved, in the alternative, for permissive intervention pursuant to Rule 24(b)(1)(B).  All seek to intervene to defend the *HVAS Order*, although only Verizon and Sprint expressly request to be aligned as defendants.

All of the intervening IXCs assert that they have an interest relating to the property or transaction that is the subject of this action and that they are so situated that disposing of the action may, as a practical matter, impair or impede their ability to protect their interests, because all participated in the underlying administrative rule-making proceedings and all are businesses affected by the resulting regulations.  They also argue that their interests are distinct from, and not adequately represented by, the IUB, essentially because they are businesses affected by the challenged regulations, as opposed to the entity that promulgated the regulations, so that they each have unique operational, competitive, and financial interests.  Aventure does not oppose the intervention of Verizon, Qwest, AT&T, or Sprint.  At the August 16, 2010, oral arguments, the IUB also represented that it had no objection to the Motions To Intervene.

20

Rule 24(a)(2) of the Federal Rules of Civil Procedure provides for intervention as of right under the following circumstances:

> On timely motion, the court must permit anyone to intervene who:
>     * * *
> (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

FED. R. CIV. P. 24(a)92). To put it another way,

> Under Rule 24(a)(2), a party is entitled to intervene as a matter of right upon filing a timely motion if: (1) she has a cognizable interest in the subject matter of the litigation, (2) the interest may be impaired as a result of the litigation, and (3) the interest is not adequately protected by the existing parties to the litigation. *Chiglo v. City of Preston*, 104 F.3d 185, 187 (8th Cir. 1997).

*Medical Liability Mut. Ins. Co. v Alan Curtis, L.L.C.*, 485 F.3d 1006, 1008 (8th Cir. 2007) (footnote omitted).

The Eighth Circuit Court of Appeals has recognized that, for purposes of Rule 24(a)(2), the prospective intervenor's interest must be "significantly protectable," which the court has interpreted to mean "legally protectable," and that general economic interests, even significant ones, are not protectable and cannot serve as the basis for intervention. *See United States v. Metropolitan St. Louis Sewer Dist.*, 569 F.3d 829, 838-39 (8th Cir. 2009); *Medical Liability Mut. Ins. Co.*, 485 F.3d at 1008 (also stating that an interest cognizable under Rule 24(a)(2) must be "direct, substantial, and legally protectable," and that an economic interest in the outcome of the litigation is not sufficient to warrant intervention as of right). Here, the prospective intervenors all assert their

economic interest in the outcome of Aventure's challenge to the regulations as supporting their intervention as of right. This interest, by itself, is not sufficient to warrant intervention as of right. *Id.*

Nevertheless, various courts have held that a party to an underlying administrative rule-making proceeding may properly intervene as of right in a subsequent judicial challenge to the resulting regulation. *See, e.g., In re Sierra Club*, 945 F.2d 776, 779 (4th Cir. 1991) (the Sierra Club could intervene as of right pursuant to Rule 24(a)(2) in an action by hazardous waste handlers challenging the constitutionality of a state's regulation of hazardous waste disposal, where it was a party to the administrative permitting proceedings involved); *Coalition of Arizona/New Mexico Counties for Stable Economic Growth v. Department of the Interior*, 100 F.3d 837, 842 (10th Cir. 1996) (the interest of a wildlife photographer, who had worked successfully to get the Mexican spotted owl on the endangered species list, had sufficient interest to intervene as of right under Rule 24(a)(2) in a subsequent action challenging that agency determination, citing, *inter alia*, *Sierra Club*); *Washington State Bldg. & Constr. Trades Council*, 684 F.2d 627, 630 (9th Cir. 1982) (holding that "the public interest group that sponsored the [statute as a ballot] initiative . . . was entitled to intervention as a matter of right under Rule 24(a)" in an action challenging the constitutionality of the statute). Therefore, the court agrees with the intervening IXCs (and Aventure) that the intervening IXCs have sufficient interest in these proceedings to intervene as of right, where they were parties to the underlying administrative proceedings in which the challenged regulations were promulgated.

The court also finds that the intervening IXCs' interests may be impaired as a result of this litigation and that their interests are not adequately protected by the existing proponent of the challenged regulations, defendant IUB. *See Medical Liability Mut. Ins. Co.*, 485 F.3d at 1008 (second and third requirements for intervention as of right pursuant

to Rule 24(a)(2)).  Plainly, whatever interests the IXCs have in continuation of the IUB's new regulations, those interests may be impaired, if this litigation results in a preliminary or permanent injunction on implementation of those new regulations.  Moreover, as the Eighth Circuit Court of Appeals has explained,

> We determine if representation is adequate "by comparing the interests of the proposed intervenor with the interests of the current parties to the action." *Sierra Club v. Robertson,* 960 F.2d 83, 86 (8th Cir. 1992).  A party generally need only make a minimal showing "that representation 'may be' inadequate" to be entitled to intervene on that basis, *Kansas Pub. Employees Ret. Sys. v. Reimer & Koger Assocs.,* 60 F.3d 1304, 1308 (8th Cir. 1995) (citing *Trbovich v. United Mine Workers,* 404 U.S. 528, 538 n. 10, 92 S. Ct. 630, 30 L. Ed. 2d 686 (1972)), but the burden is greater if the named party is a government entity that represents interests common to the public. *Curry v. Regents of Univ. of Minn.,* 167 F.3d 420, 423 (8th Cir. 1999) (describing the doctrine of *parens patriae*). We presume that the government entity adequately represents the public, and we require the party seeking to intervene to make a strong showing of inadequate representation; for example, it may show that its interests are distinct and cannot be subsumed within the public interest represented by the government entity. *Id.; see also Mille Lacs Band of Chippewa Indians v. Minnesota,* 989 F.2d 994, 1000 (8th Cir. 1993). The party may meet that burden by showing that its interests at risk in the litigation are not shared by the general citizenry. *See Mille Lacs Band,* 989 F.2d at 1001 (noting that a specific property interest in the outcome of the litigation goes beyond the general public interest in the preservation of natural resources); *Ubbelohde,* 330 F.3d at 1025 (noting that when the government is forced to weigh competing interests, such as weighing upstream and downstream interests in the management of a river system, it may favor one over another and therefore be unable to adequately represent the conflicting interests).  It is not sufficient that the party seeking

> intervention merely disagrees with the litigation strategy or
> objectives of the party representing its interests. *Chiglo,* 104
> F.3d at 188.

*Little Rock Sch. Dist. v. North Little Rock Sch. Dist.*, 378 F.3d 774, 780 (8th Cir. 2004).
Here, even assuming that the IUB is a government agency that adequately represents the
public's interest, the intervening IXCs have shown that they have peculiar interests that are
distinct from the public interest in available, efficient, economical telecommunications
services that the IUB can be expected to protect. The IXCs' interests are unique
operational, competitive, and financial interests.

Therefore, the IXCs' unresisted motions to intervene as of right will be granted; the
court need not consider Verizon's, AT&T's, and Sprint's alternative arguments for
permissive intervention. As a result of their intervention as of right, the court will give
full consideration to the IXCs' arguments, as well as the IUB's, in resistance to Aventure's
Motion For Preliminary Injunction.


### B. Qwest's "Jurisdictional" Challenges

It is an intervenor, Qwest, rather than the IUB, that raises "jurisdictional"
challenges to Aventure's Motion For Preliminary Injunction and, presumably, Aventure's
Complaint. In essence, Qwest's "jurisdictional" challenges are as follows: The *HVAS
Order* is subject to judicial review in Iowa state courts, so this court should abstain from
hearing **Count I**; all of Aventure's claims, to the extent that they are based on Aventure's
allegations regarding related, pending IUB proceedings, require the court to abstain under
the *Younger* Doctrine; and, as to **Counts II through IX**, Aventure has not exhausted its
administrative remedies pursuant to the prudential doctrine. Because Aventure did not

address any such "jurisdictional" issues in its Motion For Preliminary Injunction, the court treated Qwest as the movant for purposes of raising these "jurisdictional" issues.

Qwest's "jurisdictional" challenges need not detain the court long, however, because the court finds that they are red herrings. First, it is well-settled that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights. *See, e.g., Independent Living Ctr. of S. Cal., Inc. v. Shewry*, 543 F.3d 1050, 1056 (9th Cir. 2008) ("It is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights."); *Planned Parenthood of Houston and Southeast Tex. v. Sanchez*, 403 F.3d 324, 334 (5th Cir. 2005) ("While there may be some lack of harmony in the case law, the rule that there is an implied right of action to enjoin state or local regulation that is preempted by a federal statutory or constitutional provision—and that such an action falls within the federal question jurisdiction—is well-established."); *Qwest Corp. v. City of Santa Fe, New Mex.*, 380 F.3d 1258, 1264 (10th Cir. 2004) ("[T]his court has concluded that federal district courts have jurisdiction over actions seeking to enjoin the enforcement of a state regulation," citing *ANR Pipeline Co. v. Corporation Comm'n of Okla.*, 860 F.2d 1571, 1576 (10th Cir. 1988), in turn relying on *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983)); *Local Union No. 12004 v. Massachusetts*, 377 F.3d 64, 75 & n. 8 (1st Cir. 2004) ("'[T]he rule that there is an implied right of action to enjoin state or local regulation that is preempted by a federal statutory or constitutional provision—and that such an action falls within the federal question jurisdiction—is well-established.'" (quoting Richard H. Fallon et al., Hart & Wechsler's *The Federal Courts & The Federal System* 903 (5th ed.2003)); *Ammex, Inc. v. Cox*, 351 F.3d 697, 702-03 (6th Cir. 2003) ("The Supreme Court's decision in *Shaw v. Delta Air Lines, Inc.* makes clear that a federal court has subject

matter jurisdiction when a person seeks to enjoin state officials from enforcing a state regulation against the person on the ground that the regulation violates federal rights.").

Second, Qwest's "jurisdictional" challenges are based on mischaracterizations of Aventure's Complaint and Motion For Preliminary Injunction. Aventure is not seeking judicial review of the IUB's rule-making proceedings, and certainly is not seeking judicial review of related pending administrative proceedings in this action, which it identifies primarily for the purpose of showing that the IUB's application of the *HVAS Order* is causing Aventure irreparable harm. Rather, Aventure is asserting that enforcement of the *HVAS Order* would violate federal rights, falling squarely within this federal court's jurisdiction.

Third, Qwest has cited no authority that a complainant in a federal action for injunctive relief from a state regulation must first "exhaust" state administrative remedies—either as a prudential or a jurisdictional matter—by bringing all of its federal law challenges to the regulation before the administrative agency in the proceedings that produced the challenged regulation.

Fourth, the rule-making proceedings that produced the *HVAS Order* have terminated. Thus, the circumstances presented here fail the first prong of the *Younger* abstention doctrine. *See Plouffe v. Ligon*, 606 F.3d 890, 892 (8th Cir. 2010) ("The *Younger* abstention doctrine, as it has evolved, provides that federal courts should abstain from exercising jurisdiction when (1) there is an ongoing state proceeding, (2) which implicates important state interests, and (3) there is an adequate opportunity to raise any relevant federal questions in the state proceeding," citing *Middlesex County Ethics Comm'n v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982)). In other words, there is no state judicial or administrative proceeding to be disrupted by Aventure's action to enjoin implementation of the *HVAS Order*. *Aaron v. Target Corp.*, 357 F.3d 768, 774 (8th Cir.

2004) (the "first *Middlesex* inquiry" considers "whether there is an ongoing state judicial proceeding that would be disrupted by the federal action").

The court rejects Qwest's "jurisdictional" challenges to Aventure's action and, therefore, turns to consideration of the merits of Aventure's Motion For Preliminary Injunction.

## C. Standards For Preliminary Injunctive Relief

As this court has explained in past cases, it is well-settled in this circuit that applications for preliminary injunctions are generally measured against the factors set forth in the seminal decision in *Dataphase Systems, Inc. v. C L Systems, Inc.,* 640 F.2d 109, 113 (8th Cir. 1981) (*en banc*). *See Wachovia Sec., L.L.C. v. Stanton*, 571 F. Supp. 2d 1014, 1031 (N.D. Iowa 2008); *Interbake Foods, L.L.C. v. Tomasiello*, 461 F. Supp. 2d 943, 954-55 (N.D. Iowa 2006); *McLeodUSA Telecommc'ns Servs., Inc. v. Qwest Corp.*, 361 F. Supp. 2d 912, 918 (N.D. Iowa 2005); *Doctor John's, Inc. v. City of Sioux City, Iowa,* 305 F. Supp. 2d 1022, 1033-34 (N.D. Iowa 2004); *Branstad v. Glickman*, 118 F. Supp. 2d 925, 937 (N.D. Iowa 2000); *Uncle B's Bakery, Inc. v. O'Rourke,* 920 F. Supp. 1405, 1411 (N.D. Iowa 1996); *accord Straights and Gays for Equality v. Osseo Area Sch. Dist.*, 471 F.3d 908, 911 (8th Cir. 2006) (same factors); *Lankford v. Sherman*, 451 F.3d 496, 503 (8th Cir. 2006) (same factors). The so-called "*Dataphase* factors" that courts must weigh to decide whether or not to grant a preliminary injunction are the following: (1) the movant's probability or likelihood of success on the merits, (2) the threat of irreparable harm or injury to the movant absent the injunction, (3) the balance between the harm to the movant and the harm that the injunction's issuance would inflict on other interested parties, and (4) the public interest. *Dataphase,* 640 F.2d at 114; *accord Stanton*, 571 F. Supp. 2d at 1032; *Interbake Foods, L.L.C.*, 461 F. Supp. 2d at 955;

*Doctor John's, Inc.,* 305 F. Supp. 2d at 1033; *Branstad I,* 118 F. Supp. 2d at 937 (quoting similar factors from *Entergy, Ark., Inc. v. Nebraska,* 210 F.3d 887, 898 (8th Cir. 2000)); FED. R. CIV. P. 65(b)(1).

The burden is on the movant to establish that injunctive relief is appropriate. *Lankford*, 451 F.3d at 503; *Baker Elec. Co-op., Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir. 1994); *Modern Computer Sys., Inc., v. Modern Banking Sys., Inc.*, 871 F.2d 734, 737 (8th Cir. 1989) (*en banc*). "'No single [*Dataphase*] factor in itself is dispositive; in each case all of the factors must be considered to determine whether on balance they weigh towards granting the injunction.'" *Baker Elec. Co-op.*, 28 F.3d at 1472 (quoting *Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc.*, 815 F.2d 500, 503 (8th Cir. 1987) (citing *Dataphase*)); *accord Lankford*, 451 F.3d at 503 ("No single factor is dispositive, as the district court must balance all factors to determine whether the injunction should issue.") (citing *Baker Elec. Co-op.*); *Bandag, Inc. v. Jack's Tire & Oil, Inc.,* 190 F.3d 924, 926 (8th Cir. 1999) ("These factors are not a rigid formula."). "'A district court has broad discretion when ruling on requests for preliminary injunctions, and [the appellate court] will reverse only for clearly erroneous factual determinations, an error of law, or an abuse of that discretion.'" *Entergy, Ark., Inc.,* 210 F.3d at 898 (quoting *United Indus. Corp,* 140 F.3d at 1179); *accord Lankford*, 451 F.3d at 503. The court abuses its discretion "where the district court rests its conclusion on clearly erroneous factual findings or erroneous legal conclusions." *Lankford*, 451 F.3d at 503-04.

### D.  Application Of The Standards

As a matter of completeness, the court will consider, at least briefly, each of the four "*Dataphase* factors." *See   Lankford*, 451 F.3d at 503 ("No single factor is

dispositive, as the district court must balance all factors to determine whether the injunction should issue.") (citing *Baker Elec. Co-op.*, 28 F.3d at 1472).

### 1. Likelihood of success

#### a. Applicable standards

The first "*Dataphase* factor" that courts must consider when ruling on an application for a preliminary injunction is the likelihood or probability of success on the merits. *Dataphase*, 640 F.2d at 114. There are two prongs to the "likelihood of success" factor.

First, likelihood of success on the merits requires that the movant find support for its position in governing law. *See, e.g., Baker Elec. Co-op.*, 28 F.3d at 1473-74 (Indian tribe's sovereignty to regulate electrical services); *ILQ Inv., Inc. v. City of Rochester*, 25 F.3d 1413, 1416 (8th Cir. 1994) (first amendment and prior restraint of expression); *City of Timber Lake v. Cheyenne River Sioux Tribe*, 10 F.3d 554, 556-58 (8th Cir. 1993) (Indian tribe's regulatory authority and authority of states to regulate activities on tribal lands); *Aziz v. Moore*, 8 F.3d 13, 15 (8th Cir. 1993) (denial of injunctive relief was proper because federal courts "must abstain from imposing injunctions on prison officials [in an action under 42 U.S.C. § 1983 action] 'in the absence of a concrete showing of a valid claim and constitutionally mandated directives for relief,'" quoting *Rogers v. Scurr*, 676 F.2d 1211, 1214 (8th Cir. 1982)).

Second, this factor requires some assessment of how likely the movant is to succeed. When determining likelihood of success, the court does *not* decide whether the movant for a preliminary injunction will ultimately win. *Heather K. v. City of Mallard,* 887 F. Supp. 1249, 1258 (citing *Glenwood Bridge, Inc. v. City of Minneapolis,* 940 F.2d 367, 371 (8th Cir. 1991)). Rather, "at the early stage of a preliminary injunction motion, the speculative nature of this particular ['likelihood of success'] inquiry militates against

any wooden or mathematical application of the test. Instead, a court should flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998) (internal citations and quotation marks omitted). More specifically, the Eighth Circuit Court of Appeals has explained, "*Dataphase* rejected the notion that the party seeking relief must show 'a greater than fifty per cent likelihood that he will prevail on the merits,' holding instead that 'where the balance of other factors tips decidedly toward plaintiff a preliminary injunction may issue if movant has raised questions so serious and difficult as to call for more deliberate investigation.'" *Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds*, 530 F.3d 724, 731 (8th Cir. 2008) (citing *Dataphase*, 640 F.2d at 113). In other words, courts should assess whether the plaintiff has a "fair chance of prevailing." *Id.* at 732.

Aventure acknowledges that, in *Planned Parenthood Minnesota, North Dakota, South Dakota*, 530 F.3d at 731-32, the Eighth Circuit Court of Appeals adopted a heightened standard for success, a "likely to prevail on the merits" standard, where the movant seeks a preliminary injunction against the implementation of a state statute. Aventure argues, however, that this standard is not applicable to a preliminary injunction against implementation of a state regulation, because the IUB's promulgation of the challenged regulations did not involve both the legislative and executive branches in the formulation of policy in the name of the public interest, but formulation solely by the executive branch, citing *Able v. United States*, 44 F.3d 128, 131-32 (2d Cir. 1995) (*per curiam*), on which the court in *Planned Parenthood* relied. Qwest and the IUB, in particular, take issue with this contention. They argue that the *Planned Parenthood* "substantial likelihood" test, rather than the "fair chance" standard, applies in this case,

because the requested injunctive relief would stay governmental action pursuant to a statute or a regulatory scheme that is the result of the full play of the democratic process.

In *Planned Parenthood*, the Eighth Circuit Court of Appeals expressly reaffirmed "that a party seeking a preliminary injunction of the implementation of a state statute must demonstrate more than just a 'fair chance' that it will succeed on the merits. We characterize this more rigorous standard . . . as requiring a showing that the movant 'is likely to prevail on the merits.'" *Planned Parenthood*, 530 F.3d at 731-32 (quoting *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975), and citing *Able*, 44 F.3d at 131). The court also noted that, "[w]here preliminary injunctions are sought to enjoin city ordinances or administrative actions by federal, state or local government agencies, we note that the Second Circuit has examined the circumstances surrounding such government actions to determine to what extent the challenged action represents 'the full play of the democratic process' and, thus, deserves the deference of the traditional test," meaning a "substantial likelihood of success," rather than the "fair chance" standard adopted in *Dataphase*. *Id.* at 733 n.6 (citing *Able*, 44 F.3d at 131-32).

Here, contrary to Aventure's contentions, the court concludes that the rule-making procedures of the IUB did not involve mere policy-making action of the executive branch, but public debate to determine the public interest. *Id.*; *Able*, 44 F.3d at 131-33. This is so, because the IUB promulgated the *HVAS Order* only after opening the proposed regulations for public comment and attempting to address concerns in those public comments. Thus, the applicable standard for "likelihood of success" here is whether Aventure has "a substantial likelihood of success" on its claims.

Yet, even if the court considers only whether Aventure has a "fair chance" of prevailing on the merits of its claims, the less rigorous standard for which Aventure argues, Aventure's Motion For Preliminary Injunction fails.

### b. Analysis

Aventure argues that it has a "fair chance" of prevailing on the merits of its claims that the *HVAS Order* is unreasonably vague, conflicts with federal law by imposing unlawful barriers to competition, unlawfully interferes with interstate commerce, and violates the filed rate doctrine and Iowa law. The court will consider each of these contentions in turn.

*i.* ***Vagueness***. Aventure argues that the *HVAS Order* is unconstitutionally vague, because it does not permit the ordinary person to understand what conduct is prohibited and it encourages arbitrary and discriminatory enforcement. Specifically, Aventure argues that the definition of "HVAS" in terms of an increase in total billings is inherently vague and confusing, because it is not clear whether the increase in question is measured against a LEC's total billings or against a LEC's billings for a single IXC. Aventure also argues that the definition of "HVAS" is so vague that it could apply to a carrier that does not provide service to any conference operator. Aventure also argues that "HVAS customer," "HVAS traffic," and "HVAS situation" are not defined in the regulations. Aventure also argues that the ability of IXCs to raise complaints if they simply believe that a situation with the same general concerns exists means that a LEC that tries to comply with the specific provisions of the *HVAS Order* and does not experience an increase in traffic may nevertheless be found to have violated the regulations. Aventure also argues that the revised regulations make failure to bill high-volume intrastate access charges in accordance with the new regulations synonymous with providing "inadequate telephone service or facilities" and allow an IXC, not just a customer, to initiate proceedings for revocation of a LEC's certificate of authority, but does so without adopting any standard at all. Thus, Aventure contends that the new regulatory scheme is based on generalities with no safe harbor for attempts at technical compliance.

The IUB and the intervening IXCs counter that there is nothing "vague" about the regulations, but they point out that the "vagueness" test for a civil regulation is less strict than the "vagueness" test for a criminal statute or regulation. They contend that the *HVAS Order* establishes a clear definition of "HVAS" and establishes a clear process for setting HVAS rates and services. More specifically, they contend that the language of the HVAS definition plainly resolves Aventure's supposed confusion about the benchmark for the increase in "total billings." Similarly, they contend that, plainly, the right of an IXC to bring a complaint, if it merely suspects a LEC is engaging in HVAS behavior, must be based on a *significant* increase in billings, even if the 100 percent threshold is not met, not on no increase, as Aventure fears. Moreover, Verizon points out that none of the public comments about these provisions suggested that they were "vague."

A regulation is not unconstitutionally vague, if "an ordinary person would know what the regulation requires." *Trans States Airlines, Inc. v. F.A.A.*, 439 F.3d 863, 865 (8th Cir. 2006) (citing *Thomas v. Hinson*, 74 F.3d 888, 889 (8th Cir. 1996), which states the test as whether the regulation "fails to give a person of ordinary intelligence a reasonable opportunity to know what is prohibited"). Put the other way around, "[t]o overcome a vagueness challenge, statutes [and regulations] must 'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly,' and 'must provide explicit standards for those who apply them.'" *Leib v. Hillsborough County Pub. Transp. Comm'n*, 558 F.3d 1301, 1310 (11th Cir. 2009) (applying this standard to a challenge to a transportation commission's regulation concerning "limousine" service permits, quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)); *G.K. Ltd. v. City of Lake Oswego*, 436 F.3d 1064, 1084 (9th Cir. 2006) (noting, in a case involving regulation of signs, "A government regulation may be unconstitutionally vague for two reasons. First, the regulation may fail to give persons of

ordinary intelligence adequate notice of what conduct is proscribed; second, it may permit or authorize 'arbitrary and discriminatory enforcement.'" (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)). The degree of vagueness that the Constitution will tolerate depends upon the nature of the regulation; thus, there is greater tolerance in the civil context than the criminal context, such that a civil regulation is unconstitutionally vague only if it is so indefinite as "'really to be no rule or standard at all.'" *Id.* (quoting *Seniors Civil Liberties Ass'n, Inc. v. Kemp*, 965 F.2d 1030, 1036 (11th Cir. 1992)). The meaning of the regulation may also be guided by common sense, *id.* at 1310-11, and plain meaning. *Trans States Airlines*, 439 F.3d at 865.

Aventure's first claim that the regulations adopted in the *HVAS Order* are unconstitutionally vague is not even colorable, let alone one on which it has a "fair chance of prevailing." *Planned Parenthood*, 530 F.3d at 732. Aventure contends that the most glaring deficiency is in the critical definition of "HVAS" as "any service that results in an increase in total billings for intrastate exchange access for a local exchange utility in excess of 100 percent in less than six months." *HVAS Order*, Utilities Division [199] at 3 (amending 199 IAC 22.1(3)). Aventure argues that this provision is vague, because an ordinary person would not know whether the reference point for the 100 percent increase is its *total billings* for all IXCs for intrastate exchange access or its *total billings* for any particular IXC. Looking to plain meaning, *TransState Airlines*, 439 F.3d at 865, and common sense, *Lieb*, 558 F.3d at 1310, "total billings for intrastate exchange access for a local exchange utility" means the LEC's total billings, not the LEC's total billings to a particular IXC. To find the ambiguity that Aventure sees, the court would have to read into the regulation language that simply is not there.

Aventure's next "vagueness" argument, that the definition of "HVAS" could apply to a carrier that does not provide service to any conference operator, fares no better. At

this point, the court has found nothing in the *HVAS Order* that indicates that it was the intention of the IUB to limit HVAS regulation to service to any conference operator; rather, as the "Background" in the *HVAS Order* indicates, service to conference operators (and, specifically, service to "conference bridges") was only one example of the kinds of service that might lead to a sudden increase in the volume of incoming or outgoing interexchange calls, other specific examples being services to chat lines and help desks. *HVAS Order* at 1-2. Moreover, as the IUB argued at oral arguments, the specific "target" of the new regulations was not the kinds of services provided by a customer of the LEC, but the sudden increase in service minutes for which a LEC might bill an IXC without a comparable increase in service costs for switched access services. *Id.*; *see also id.* at 3-8. Thus, the possibility that the HVAS regulations might apply to a LEC that does not service any conference operator does not make the HVAS regulations vague, in any sense.

Although the court acknowledges that the *HVAS Order* does not expressly define "HVAS customer," "HVAS traffic," or "HVAS situation," the lack of such definitions does not make the regulations unconstitutionally vague. As explained above, looking to plain meaning, *TransState Airlines*, 439 F.3d at 865, and common sense, *Lieb*, 558 F.3d at 1310, where the "target" of the new regulations is the sudden increase in service minutes for which a LEC might bill an IXC without a comparable increase in service costs for switched access services, a "HVAS situation" is one involving such an increase in service minutes without a comparable increase in costs, a "HVAS customer" is a customer whose addition causes such an increase in service minutes without a comparable increase in costs, and "HVAS traffic" is the call traffic that results in a sudden increase in service minutes without a comparable increase in costs. In other words, where "HVAS" is not unconstitutionally vague, neither are "HVAS situation," "HVAS traffic," or "HVAS customer."

Similarly, the court does not perceive any possibility that the new regulations are vague, because they create no safe harbor for technical compliance, in that they allow IXCs to raise complaints if they simply believe that a situation with the same general concerns exists, so that a LEC that does not experience an increase in traffic may nevertheless be found to have violated the regulations. In pertinent part, new paragraph 22.14(2)"e" provides, "Any interexchange utility that believes a situation has occurred or is occurring that does not specifically meet the HVAS threshold requirements defined in subrule 22.1(3), but which raises the same general concerns and issues as an [sic] HVAS situation may file a complaint with the board pursuant to these rules." *HVAS Order*, Utilities Division [199], at 3-5. The "threshold requirements" identified in subrule 22.1(3) are "any service that results in an increase in total billings for intrastate exchange access for a local exchange utility in excess of 100 percent in less than six months." *HVAS Order*, Utilities Division [199] at 3 (amending 199 IAC 22.1(3)). Thus, plain meaning, *TransState Airlines*, 439 F.3d at 865, and common sense, *Lieb*, 558 F.3d at 1310, require that some *significant* increase in total billings for intrastate exchange access, albeit less than 100 percent, within some period, perhaps less than or greater than six months, is required to "raise[] the same general concerns and issues" as a true "HVAS situation," as defined in Rule 22.1(3).

Finally, Aventure does not have a "fair chance of prevailing," *Planned Parenthood*, 530 F.3d at 732, on its claim that the revised regulations are unconstitutionally vague, because they make failure to bill high-volume intrastate access charges in accordance with the new regulations synonymous with providing "inadequate telephone service or facilities" and allow an IXC, not just a customer, to initiate proceedings for revocation of a LEC's certificate of authority, purportedly without adopting any standard at all. Reading the pertinent new portion of Rule 22.20(5), in light of plain meaning, *TransState Airlines*, 439

F.3d at 865, and common sense, *Lieb*, 558 F.3d at 1310, "failure to bill high-volume intrastate access (HVAS) charges *in a manner consistent with the requirements of 199 IAC 22.14*," Amended Rule 22.20(5) (emphasis added), is not "standardless," and the remaining, unamended portions of this rule establish the required procedures for the IUB's disposition of the complaint. *Id.* ("While similar in nature to a complaint filed under rule 199-6.2(476), a petition under this rule shall be addressed by the board under the following procedure and not the procedure found in 199—Chapter 6.").

While there may be other colorable claims that there are constitutional or other problems with the new regulations, vagueness is not one of those problems, at least on Aventure's present showing. Thus, preliminary injunctive relief is not warranted on the basis of likelihood of success on Aventure's "vagueness" claims.

*ii.* ***Barriers to competition***. Aventure argues, next, that it has sufficient likelihood of success on its claim that the *HVAS Order* violates the Supremacy Clause by contravening the federal regulatory scheme under 47 U.S.C. § 253(a), which bars any state or local authority from prohibiting or having the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service. Here, Aventure argues that the *HVAS Order* empowers IXCs to petition for a LEC's certificate of authority to be rescinded based on failure to bill for access services in accordance with the new rules adopted by the IUB, and if the IUB revoked a certificate for the failure to bill appropriately, a LEC would not be permitted to provide telephone service in the state. The lack of a certificate would also mean that the LEC would be unable to obtain telephone numbers from the NANPA, so that it could not provide interstate or intrastate services.

Aventure also argues that the *HVAS Order* does not fall within the "saving clause" of § 253(b), because it is not competitively neutral, consistent with § 254, or necessary to preserve and advance universal service. The *HVAS Order* is not competitively neutral,

Aventure argues, because it withdraws from LECs the option to opt into association tariffs, thereby imposing an excessive burden on all carriers that provide HVAS. Aventure also argues that the *HVAS Order* creates a back door to regulate the rates for all new LECs in Iowa, because all new providers might experience a 100 percent increase in business during their initial six months of operation and, thus, be forced into HVAS negotiations which, if unsuccessful, could result in the IUB setting rates for the new entrant. Finally, Aventure argues that the *HVAS Order* is not competitively neutral, because it harms the competitive conference calling business by treating conference calling services differently from other services.

The IUB and invervening IXCs assert that Aventure's argument depends on the notion that the hypothetical possibility of a certificate revocation for violation of IUB rules, after notice and opportunity for hearing, is enough to violate 47 U.S.C. § 253(a). They contend, however, that the test is whether there is an "actual or effective prohibition," not merely a hypothetical one. Here, they argue, the challenged rules do not provide for an "automatic" revocation of a certificate, but only the possibility of revocation after due process. They also argue that the new regulations clearly fall within the savings clause in § 253(b), because they are competitively neutral, in that they do not distinguish between incumbents and new entrants at the local exchange level. They point out that small rural LECs are *not* similarly situated to large incumbents in the first place, so that Aventure's competitive neutrality argument fails on its point of comparison.

The parties agree that the controlling case on this issue is *Level 3 Communications, L.L.C. v. City of St. Louis, Mo.*, 477 F.3d 528 (8th Cir. 2007). That decision states, in pertinent part, the following:

> Section 253 (a) states: "No State or local statute or regulation, or other State or local legal requirement, may

prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." Under a plain reading of the statute, we find that a plaintiff suing a municipality under section 253(a) must show actual or effective prohibition, rather than the mere possibility of prohibition. We again acknowledge that other courts hold otherwise and suggest that possible prohibition will suffice. *Qwest Commc'ns Inc. v. City of Berkeley*, 433 F.3d 1253, 1256 (9th Cir. 2006); *Qwest Corp. v. City of Portland*, 385 F.3d 1236, 1239 (9th Cir. 2004), *cert. denied*, 544 U.S. 1049, 125 S. Ct. 2300, 161 L. Ed. 2d 1089 (2005); *Qwest Corp. v. City of Santa Fe*, 380 F.3d 1258, 1270 n. 9 (10th Cir. 2004); *City of Auburn v. Qwest Corp.*, 260 F.3d 1160, 1175 (9th Cir. 2001)*; see also Puerto Rico v. Municipality of Guayanilla*, 450 F.3d 9, 18 (1st Cir. 2006); *Puerto Rico Tel. Co. v. Telecomms. Regulatory Bd.*, 189 F.3d 1, 9 (1st Cir. 1999).

We disagree with the approach of our sister circuits because they reach a conclusion contrary to a complete analysis of the section. Examination of the entirety of section 253(a) reveals the subject of the sentence, "[n]o State or local statute or regulation, or other State or local legal requirement" is followed by two discrete phrases, one barring any regulation which prohibits telecommunications services, and another barring regulations achieving effective prohibition. However, no reading results in a preemption of regulations which might, or may at some point in the future, actually or effectively prohibit services, as our sister circuits seem to suggest. By inserting the word "that" before "may," as one circuit has done, *Puerto Rico v. Municipality of Guayanilla*, 450 F.3d at 18 (1st Cir. 2006), or by creative quotation, as another circuit has found convenient, *e.g., Qwest Corp. v. City of Portland*, 385 F.3d at 1239 (9th Cir. 2004), the most precise meaning of section 253(a) has been distorted.

When the language of a statute is clear, as we believe is the case with section 253(a), our only duty is to enforce the enactment according to its terms. *E.g., Lamie v. United States*

> *Trustee*, 540 U.S. 526, 534, 124 S.Ct. 1023, 157 L.Ed.2d
> 1024 (2004). Thus, we hold that a plaintiff suing a
> municipality under section 253(a) must show actual or
> effective prohibition, rather than the mere possibility of
> prohibition. The plaintiff need not show a complete or
> insurmountable prohibition, *see TCG New York, Inc. v. City of
> White Plains*, 305 F.3d 67, 76 (2d Cir. 2002), but it must
> show an existing material interference with the ability to
> compete in a fair and balanced market. *Cal. Payphone Ass'n,*
> 12 F.C.C.R. 14,191, 14,206, 1997 WL 400726(FCC) ¶ 31
> (July 17, 1997).

*Level 3 Communications*, 477 F.3d at 532-33.

The court must agree with the IUB and the IXCs that, not only does Aventure have no "substantial likelihood" of success on its claim of a violation of § 253(a), it does not even have a "fair chance" of success on that claim. *See Planned Parenthood*, 530 F.3d at 731-33 (recognizing these two standards for "success on the merits," each applicable in appropriate circumstances). Aventure's entire argument that the regulations impose illegal barriers to competition within the meaning of § 253(a) depends upon hypothetical, speculative, or possible harms, not a showing of "actual or effective prohibition," because all are based on the *possibility* of revocation of a LEC's certificate for non-compliance with the *HVAS Order*. *Id.* However, before revocation of a certificate or a bar on obtaining telephone numbers from the NANPA could be imposed, the new regulations put in place numerous procedural steps, including notice and the opportunity to be heard. The "revocation" provisions are not self-executing or automatic. Thus, Aventure has cited no "actual or effective" prohibition.[8] This claim does not warrant issuance of a preliminary injunction.

---

[8]Under these circumstances, the court never reaches Aventure's "safe harbor" and "competitive neutrality" arguments under § 253(b).

***iii.*** ***Interference with interstate commerce***. Aventure argues that the *HVAS Order* improperly interferes with interstate commerce, because it has extraterritorial reach, in the authorization to revoke certificates, in that the effect of the regulation could be to force LECs to cease providing interstate telecommunications services. Aventure points out that approximately 98% of its traffic is interstate in nature, so that revoking its certificate would have the effect of controlling a considerable amount of conduct beyond Iowa in violation of the Commerce Clause. The burden, Aventure argues, is clearly excessive in relation to the putative local benefit, because the IUB's implicit goal of making unviable competitive conferencing services in Iowa from LECs and conference call providers is heavily outweighed by the harm the *HVAS Order* imposes by putting LECs out of business and generally impeding competition. Aventure argues that only the national IXCs stand to benefit from using Aventure's services without providing reasonable compensation, but the IUB has not identified any legitimate *local* public interest that warrants the radical disruption of interstate commerce that would result from enforcement of the *HVAS Order*.

The IUB and the IXCs counter that Aventure offers an absurd argument that Iowa would not be able to revoke Aventure's state-issued certificate for violating Board rules due to an alleged effect on interstate commerce. They point out that the federal regulatory regime left regulation of intrastate telecommunications services to the states. They argue that, to the extent that the hypothetical revocation of a certificate would have any effect on a LEC's ability to offer interstate services, the FCC has delegated to the states its jurisdiction over the North American Numbering Plan. They also argue that Aventure's "commerce clause" or "dormant commerce clause" argument fails, because there is no extraterritorial regulation; instead, Aventure again relies on the consequences of certificate revocation, which can only result from repeated failure to comply with the HVAS rules. To the extent a balancing test is implicated, they argue that Iowa has a strong interest in

regulating public utilities, that traffic-pumping schemes disrupt the purposes of the access charge regime, and that the IUB has a legitimate interest in ending such abuse of the system, where there are no countervailing interests to balance.

A statute, and presumably a regulation, may violate the "dormant Commerce Clause" in three ways: "(1) the statute clearly discriminates against interstate commerce in favor of in-state commerce, *Jones v. Gale*, 470 F.3d 1261, 1267 (8th Cir. 2006); (2) it imposes a burden on interstate commerce that outweighs any benefits received, *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970); or (3) it has the practical effect of extraterritorial control of interstate commerce, *see Healy v. Beer Inst.*, 491 U.S. 324, 336, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989)." *Grand River Enters. Six Nations, Ltd. v. Beebe*, 574 F.3d 929, 942 (8th Cir. 2009). Aventure appears to rely on the second and possibly the third kinds of violations.

As the Eighth Circuit Court of Appeals has explained, "State legislation is valid under the *Pike* balancing test if 'the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental.'" *Id.* (quoting *Pike*, 397 U.S. at 142). "The statute will be upheld 'unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.'" *Id.* (again quoting *Pike*). Aventure has no "substantial likelihood" of success on its "interference with interstate commerce" claim under this test, nor even a "fair chance" of success on that claim. *See Planned Parenthood*, 530 F.3d at 731-33 (recognizing these two standards for "success on the merits," each applicable in appropriate circumstances). The new regulations plainly serve a legitimate local public interest of preventing abuse of the intrastate tariff regime by traffic-pumping, that is, pursuing high volume access clients to take advantage of tariff rates established on the basis of relatively low volume and relatively high cost. Moreover, any effect of the potential decertification penalties under

the new regulations has, at most, only an incidental effect on interstate commerce. *See Grand River Enterprises*, 574 F.3d at 942. In short, the burden imposed upon interstate commerce by the possibility of decertification is *not* clearly excessive in relation to the putative local benefit. *Id.*

Aventure's "interference with interstate commerce" claim is similarly flawed, to the extent that it is a claim that the new regulations have the practical effect of extraterritorial control of interstate commerce. *Id.* at 942. The test is not just "extraterritorial reach" of the regulation, as Aventure suggests, but "extraterritorial control of interstate commerce." *Id.* As the IUB and the IXCs point out, there is perhaps some extraterritorial effect of the new regulations, to the extent that they could lead to decertification of a LEC, making it impossible for the LEC to provide interstate services, but that incidental effect falls far short of any "extraterritorial control" of interstate commerce.

Aventure is not entitled to a preliminary injunction on the basis that it is likely to succeed on this claim, either.

  ***iv.***   ***Violation of Iowa law and the filed rate doctrine***. Finally, Aventure argues that it has sufficient likelihood of success on its claim that the *HVAS Order* violates the filed rate doctrine and Iowa law for the court to enter a preliminary injunction against implementation of that order. Aventure argues, as an initial matter, that the IUB has unilaterally preempted the normal tariff filing process by requiring LECs providing HVAS to negotiate with all IXCs simultaneously, rather than following the normal tariff filing procedures. Aventure also argues that IOWA CODE § 476.11, upon which the IUB relies, establishes a complaint-based regulatory system, but does not permit the IUB to establish access rates on a complaint *prior* to the filing of a tariff. Aventure also argues that the IUB's new regulations conflict with IOWA CODE § 476.29(9), because they improperly

expand "failure of a utility to furnish reasonably adequate telephone service and facilities" with failure to bill properly for HVAS.

Aventure argues, further, that the *HVAS Order* is in irreconcilable conflict with the filed-rate doctrine and the Iowa Code, because it provides that, "No access charges shall apply to the HVAS traffic until an access tariff for HVAS is accepted for filing by the board and has become effective," but the IUB has not limited the application of the *HVAS Order* to carriers that do not currently have a tariff on file. Thus, Aventure argues, a carrier currently providing service to conference call companies, for example, may be required by statute to bill pursuant to its filed tariff, IOWA CODE § 476.3(1), while simultaneously being found to violate the IUB's new regulations prohibiting the assessment of charges for HVAS traffic until a new tariff is accepted by the IUB. Aventure argues that the conflicting requirements of the filed rate doctrine and the IUB's new regulations means that it is impossible for the carrier to comply with both.

The IUB and intervenors point out that the negotiation of rates for the services in question has been contemplated by Iowa law for half a century. They point out that IOWA CODE § 476.11 already provides that carriers are expected to attempt to reach agreement as to the terms and procedures for the exchange of toll traffic, and if they cannot agree, the IUB has the authority and obligation to determine those terms and conditions. They point out that the Iowa Supreme Court determined that the authority over "terms and conditions" includes authority over financial matters or rates for the exchange of traffic, citing *Northwestern Bell Tel. Co. v. Hawkeye State Tel. Co.*, 165 N.W.2d 771, 775 (Iowa 1969). They also point out that IOWA CODE § 476.4, which requires the filing of tariffs, also establishes the IUB's authority over the procedures that govern those filings. They also argue that the IUB's determination that failing to bill at appropriate rates constitutes

a failure to provide adequate service warranting revocation of a certificate is entitled to deference.

The IUB and the IXCs also argue that the new regulations are not in conflict with the filed rate doctrine. They argue that, if a LEC were to try to charge its normal intrastate access rates for HVAS traffic, it would be violating the filed rate doctrine, because such traffic is no longer included in any tariff, pursuant to the Final Order in the *IUB Proceedings*.

Again, Aventure has no "substantial likelihood" of success on its "violation of Iowa law and filed rate doctrine" claim, nor even a "fair chance" of success on that claim. *See Planned Parenthood*, 530 F.3d at 731-33 (recognizing these two standards for "success on the merits," each applicable in appropriate circumstances). First, contrary to Aventure's contention that "terms and conditions" within the IUB's authority under § 476.11 do not include financial matters, such as rates, the Iowa Supreme Court long ago settled the question, under a nearly identical predecessor statute, finding that "terms and conditions" include, but are not *limited* to, financial matters. *Northwestern Bell Tel. Co.*, 165 N.W.2d at 775 (interpreting former IOWA CODE § 490A.11).[9] Section 476.11 also expressly

---

[9] IOWA CODE § 476.11 provides, in pertinent part, as follows: "Whenever toll connection between the lines or facilities of two or more telephone companies has been made, or is demanded under the statutes of this state and the companies concerned cannot agree as to the terms and procedures under which toll communications shall be interchanged, the board upon complaint in writing, after hearing had upon reasonable notice, shall determine such terms and procedures." The predecessor statute discussed in *Northwestern Bell*, IOWA CODE § 490A.11, provided as follows: "'Whenever toll connection between the lines or facilities of two or more telephone companies has been made, or is demanded under the statutes of this state and the companies concerned cannot agree as to the terms and procedures under which toll communications shall be interchanged, the commission upon complaint in writing, after hearing had upon

(continued...)

establishes a procedure involving negotiation, rather than the filing of a tariff, as the first step in the determination of rates, so that imposing such a requirement for HVAS does not, as Aventure contends, preempt the normal tariff filing process. Nor is amended Rule 22.20(5), which equates failure to bill for HVAS appropriately with failure to furnish reasonably adequate telephone service and facilities, in irreconcilable conflict with IOWA CODE § 476.29(9).[10] Issuance of bills is reasonably understood to be part of a LEC's services, and the IUB's interpretation of what falls within the scope of § 475.29(9) is entitled to deference. *See Iowa Telecommunications Ass'n v. City of Haywarden*, 589 N.W.2d 245 (Iowa 1999).

Second, the court does not find even a "fair chance" that the new regulations violate the filed rate doctrine. IOWA CODE § 476.5 does provide, in pertinent part, as follows:

> No public utility subject to rate regulation shall directly or indirectly charge a greater or less compensation for its services than that prescribed in its tariffs, and no such public utility shall make or grant any unreasonable preferences or advantages as to rates or services to any person or subject any person to any unreasonable prejudice or disadvantage.

IOWA CODE § 476.5. However, as the IUB and the IXCs point out, Aventure currently has no filed tariff for HVAS, as its tariff based on the associational rate was invalidated by the new regulations and by the Final Order in the *IUB Proceedings*. The court also simply

---

[9](...continued)
reasonable notice, shall determine such terms and procedures." *See Northwestern Bell*, 165 N.W.2d at 774-75.

[10]IOWA CODE § 476.29(9) provides, in pertinent part, as follows: "A certificate may, after notice and opportunity for hearing, be revoked by the board for failure of a utility to furnish reasonably adequate telephone service and facilities."

does not see how requiring that HVAS be subject to a separate tariff violates the filed rate doctrine, where the regulations ultimately require that a tariff rate be filed for such services.

Thus, this claim also does not warrant preliminary injunctive relief.

### 2. Threat of irreparable harm

Notwithstanding that the court has found no likelihood of success on any of Aventure's claims, the court will consider, at least briefly, the other requirements for preliminary injunctive relief, assuming that, contrary to its conclusions, Aventure does have some sufficient likelihood of success. The court turns, therefore, to the second "*Dataphase* factor," the threat of irreparable harm to the movant absent the injunction. *Dataphase,* 640 F.2d at 114.

### a. Applicable standards

In this circuit, "a party moving for a preliminary injunction is required to show the threat of irreparable harm," *Baker Elec. Co-op.*, 28 F.3d at 1472 (citing *Modern Computer Sys.*, 871 F.2d at 738, and *Dataphase*), and the lack of irreparable harm is sufficient ground for denying or vacating a preliminary injunction. *Aswegan v. Henry*, 981 F.2d 313, 314 (8th Cir. 1992) (citing *Modern Computer Sys.*, 871 F.2d at 738). Stated differently, "[t]he threshold inquiry is whether the movant has shown the threat of irreparable injury." *Glenwood Bridge*, 940 F.2d at 371 (quoting *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987)). More specifically, the Eighth Circuit Court of Appeals has held that

> the movant's failure to sustain its burden of proving irreparable harm ends the inquiry "and the denial of the injunctive request is warranted." [*Gelco*, 811 F.2d] at 420. *Accord Modern Computer Sys.*, 871 F.2d at 738; *Dataphase*, 640 F.2d at 114 n.9. We must inquire, then, whether [the

47

movant] has met its burden of proving that it will suffer irreparable harm absent a preliminary injunction.

*Id.* The Eighth Circuit Court of Appeals has also explained,

> "[T]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Beacon Theaters, Inc. v. Westover,* 359 U.S. 500, 506-07 (1959). Thus, to warrant a preliminary injunction, the moving party must demonstrate a sufficient threat of irreparable harm. *See Adam-Mellang v. Apartment Search, Inc.,* 96 F.3d 297, 299 (8th Cir. 1996).

*Bandag, Inc. v. Jack's Tire & Oil, Inc.,* 190 F.3d 924, 926 (8th Cir. 1999); *see Baker Elec. Co-op.,* 28 F.3d at 1472 ("No single factor in itself is dispositive; in each case all of the factors must be considered to determine whether on balance, they weigh towards granting the injunction. However, a party moving for a preliminary injunction is required to show the threat of irreparable harm.") (internal quotation marks and citations omitted).

Sufficient showing on this second factor in the *Dataphase* analysis can be made, for example, by showing that the movant has no adequate remedy at law. *Baker Elec. Co-op.,* 28 F.3d at 1473. Conversely, where the movant has an adequate legal remedy, a preliminary injunction will not issue. *Frank B. Hall & Co. v. Alexander & Alexander, Inc.,* 974 F.2d 1020, 1025 (8th Cir. 1992) (but finding in that case that the district court's conclusion that there was an adequate remedy was based on an erroneous legal premise, and requiring a proper balance of *Dataphase* factors).

### b.    *Arguments of the parties*

Aventure argues that, because it cannot obtain damages for the IUB's violation of federal law, even if it prevails on its claims, it has no adequate remedy at law, which is sufficient, standing alone, to satisfy the "irreparable harm" requirement for a preliminary injunction. Moreover, Aventure argues that the denial of a constitutional right is sufficient

to demonstrate irreparable harm. However, Aventure argues that it faces more concrete irreparable harms. First among these, Aventure argues, is the failure of the IUB to establish a baseline for determining whether Aventure has experienced an increase in traffic that would satisfy the IUB's definition of HVAS, so that it has no way of knowing when it must comply with the new regulations. Aventure also argues that it will be forced to forego billing for interstate access services pursuant to its tariff during a negotiation process, and it would never be able to recover those lost revenues, because the *HVAS Order* does not permit retroactive application of the rate ultimately negotiated for HVAS. Aventure also contends that it could lose its certificate to provide telecommunications services in Iowa and, if it does, it might never be able to recover its business, because of the loss of customers and the injury to its reputation. Finally, Aventure argues that the *HVAS Order* has twice been used to deny it certification to serve the Sioux City, Iowa, area.

The IUB and the IXCs argue that Aventure's claims of a threat of immediate harm ring hollow, where it waited nearly two months, until the eve of the effective date of the new regulations, before moving to enjoin them. They also contend that Aventure's claims of irreparable harm are undermined by the insufficiency of Aventure's claims for relief. They also contend that the purely hypothetical possibility of revocation of Aventure's certificate cannot demonstrate the required threat of irreparable harm. They argue that Aventure's reluctance to state its intent to comply with the *HVAS Order* is only one of several reasons that the IUB has denied or has required further investigation of Aventure's tariff applications to serve the Sioux City, Iowa, area.

### c.    *Analysis*

Aventure's arguments concerning "irreparable harm" are premised on the viability of its claims, but the court has not found any of those claims to be viable. Thus, Aventure

has no denial of constitutional rights by which it can be harmed, and cannot be harmed by the lack of a "baseline" for determining whether it fits the HVAS decision, where the court found that the regulation did, indeed, plainly state the applicable baseline. Moreover, even if there is a possibility that Aventure could lose its certificate, that possibility depends upon Aventure repeatedly failing to comply with the new regulations and having been found to be derelict for not doing so after notice and an opportunity to be heard. Aventure cannot reasonably argue that, where avoidance of the possible harm lies within its power, and it will be afforded adequate due process before the prospective harm, revocation of its certificate, is imposed, it faces any immediate threat of irreparable harm. *Baker Elec. Co-op.*, 28 F.3d at 1472. The court also rejects Aventure's contention that it is being irreparably harmed by use of the new HVAS regulations to deny or delay acceptance of its new tariffs. A review of the record shows that Aventure's reluctance to comply with the HVAS regulations is but one of several reasons that the IUB has delayed action on Aventure's requests for approval of tariffs. Other reasons include Aventure's failure to comply with other IUB regulations or the IUB's requests for information.

This factor does not weigh in favor of a preliminary injunction.

### 3. *Balance of harms*

#### a. *Applicable standards*

The third "*Dataphase* factor" is the "balance of harms." *See Dataphase,* 640 F.2d at 114 (the third factor is the balance between the harm and the injury that the injunction's issuance would inflict on other interested parties). The "balance of harms" analysis is not identical to the "irreparable harm" analysis. *Pottgen v. Missouri State High Sch. Activities Ass'n*, 40 F.3d 926, 929 (8th Cir. 1994). Irreparable harm focuses on the harm or potential harm to the movant of the opposing party's conduct or threatened conduct. *Dataphase*, 640 F.2d at 114. In contrast, the balance of harms analysis examines the harm

of granting or denying the injunction upon both of the parties to the dispute and upon other interested parties, including the public. *Id.*; *see also Glenwood Bridge*, 940 F.2d at 372 (considering the effect of granting or denying the injunction on the public's interest in a public works construction project as well as upon the parties in the balance of harm analysis); *Modern Computer Sys.*, 871 F.2d at 737-38 (harm to other interested parties also considered).

In conducting the "balance of harms" analysis required under *Dataphase*, it is obvious that an illusory harm to the movant will not outweigh any actual harm to the non-movant. *Frank B. Hall*, 974 F.2d at 1023. To determine what must be weighed, the court finds that courts of this circuit have looked at the threat to each of the parties' rights that would result from granting or denying the injunction. *Baker Elec. Co-op.*, 28 F.3d at 1473. Also, the potential economic harm to each of the parties and to interested third parties of either granting or denying the injunction is relevant. *Id.* Another consideration in the balance of harms calculus is whether the defendant has already voluntarily taken remedial action. *Sanborn Mfg.*, 997 F.2d at 489. Where the non-movant has taken such action, the balance of harms is readjusted, because the potential for economic or other harm to the movant has been eliminated. *Id.* (citing *Burndy Corp. v. Teledyne Indus., Inc.*, 748 F.2d 767, 774 (2d Cir. 1984), which held that injunctive relief was "wholly unnecessary" when the defendant had voluntarily brought his product labeled with the UL mark into compliance with UL standards and where there was not a likelihood of repetition or hazard to the public). Similarly, present harm as the result of past misconduct is not sufficient to justify the injury to the non-movant of granting a preliminary injunction requiring some additional corrective action, because such relief "goes beyond the purpose of a preliminary injunction." *Id.* at 490.

### b.    *Arguments of the parties*

Aventure argues that it is "clear" that the harms it has alleged significantly outweigh any conceivable harm to other interested parties. This is so, Aventure argues, because the entry of a preliminary injunction cannot harm a state agency, which would only lose its right to hear complaints and establish rates under the new rules. Aventure also argues that no harm will befall the state or to the IXCs, because granting the preliminary injunction will only maintain the *status quo*. Aventure notes that most IXCs have not paid Aventure for intrastate access charges for many months, or even years, so that they cannot demonstrate that any harm would flow to them from restricting application of the New HVAS rules.

The IUB and the IXCs argue that Aventure has little, if any, potential harm, if no preliminary injunction issues, because Aventure is harmed, at most, by delay in collection of revenues. They argue that the countervailing interest is that a preliminary injunction would allow Aventure to inflict injury on IXCs by billing at unreasonable rates for HVAS, which the IXCs may never be able to recover, even if refunds are ordered.

### c.    *Analysis*

Even if Aventure had some likelihood of success on the merits of its claims, the court concludes that the balance of harms does not weigh in favor of issuance of a preliminary injunction. The potential harm to Aventure, if the regulations are implemented unimpeded is not, as Aventure suggests, its imminent demise. Indeed, the speculative possibility of revocation of its certificate borders on, if not crosses the line, into realm of an illusory harm that will not outweigh any actual harm to the non-movant. *Frank B. Hall*, 974 F.2d at 1023. On the other hand, the harm to the IUB of an injunction is the IUB's inability to administer reasonable rates for telecommunications services, and the harm to the IXCs is continued payment of unreasonable rates for HVAS. In balance, the potential

harm to the IUB and the IXCs of enjoining the regulations outweighs the illusory harm to Aventure if no injunction is entered. This factor also does not weigh in favor of a preliminary injunction.

### 4. *The public interest*

The final "*Dataphase* factor" is "the public interest." *See Branstad I*, 118 F. Supp. 2d at 943; *see also Pottgen*, 40 F.3d at 929; *Dataphase,* 640 F.2d at 114. The "public interest" factor frequently invites the court to indulge in broad observations about conduct that is generally recognizable as costly or injurious. *Id.* However, there are more concrete considerations, such as reference to the purposes and interests any underlying legislation was intended to serve, a preference for enjoining inequitable conduct, and the public's interest in minimizing unnecessary costs to be met from public coffers. *B & D I*, 231 F. Supp. 2d at 912 (citations and quotation marks omitted).

Aventure argues that there is no benefit to the public from implementation or enforcement of an order that exceeds the IUB's authority and that is unconstitutional. Aventure also argues that there will be no negative impact on the public interest, if Aventure is not forced to enter into negotiations or if the IUB is not allowed to set rates for intrastate access services during the pendency of this case. The IUB and the IXCs, on the other hand, argue that there is a significant public interest in ending abuse of the existing rates regime, which allows LECs to impose unreasonable rates for HVAS, as well as an interest in allowing properly promulgated regulations to go into effect.

The court agrees with the IUB and the IXCs that the public interest factor also does not favor issuance of a preliminary injunction. The public interest favors allowing regulations promulgated for the ostensible purpose of maintaining a reasonable relationship between rates and costs to go into effect, in the absence of an adequate showing of any of the deleterious effects that Aventure alleges the public will suffer from such regulations.

### III.  CONCLUSION

Upon consideration of the pertinent factors in light of the arguments of the parties and the record in the case, the court **denies** Aventure's August 3, 2010, Motion For Preliminary Injunction (docket no. 12).  On the other hand, the Motions To Intervene by Verizon (docket no. 20), Qwest (docket no. 24), AT&T (docket no. 33), and Sprint (docket no. 35) are **granted**.

**IT IS SO ORDERED.**

**DATED** this 17th day of August, 2010.

MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA